UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 1:22-cr-00155-LEW |
| | ) | |
| JASON LEVASSEUR, | ) | |
| | ) | |
| Defendant | ) | |

## ORDER ON DEFENDANT'S MOTION TO DISMISS INDICTMENT

The grand jury charged Defendant Jason Levasseur with Possession of a Firearm by a Prohibited Person (Felon), in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Levasseur has moved to dismiss the indictment, contending that this prosecution would violate his Second Amendment rights.   Motion to Dismiss Indictment (ECF No. 26). Because § 922(g)(1) is constitutional as applied to Levasseur, his motion to dismiss is DENIED.

### BACKGROUND

Levasseur is alleged to have possessed a firearm while knowing that he was previously convicted of crimes punishable by terms of imprisonment exceeding one year. The alleged prior convictions are:

- Three convictions for the illegal possession of a firearm under 15 M.R.S. § 393(1)(A-1);

- One conviction for the operation of a motor vehicle after a habitual offender revocation under 29-A M.R.S. § 2557-A(1)(A);

1

- One conviction for the unlawful possession of scheduled drugs, namely, methamphetamine, under 17-A M.R.S. § 1107-A(1)(B)(7); and

- One conviction for the violation of conditions of release under 15 M.R.S. § 1092(1)(B).

Levasseur has moved to dismiss the indictment. *See* Fed. R. Crim P. 12(b)(1). In ruling on this motion, the Court presumes that the Government's allegations are true to determine whether § 922(g)(1) is unconstitutional as applied to Levasseur. *See United States v. Guerrier*, 669 F.3d 1, 3–4 (1st Cir. 2011).[1]

## DISCUSSION

Section 922(g)(1) makes it unlawful for any person "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce" a firearm.[2] Levasseur has moved to dismiss the indictment, arguing that this prosecution would violate his Second Amendment rights as interpreted by the United States Supreme Court in *New York State Rifle and Pistol Ass'n*, *Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

---

[1] Levasseur is presumed to be innocent, and the Government bears the burden of proving that Levasseur has been convicted of "a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). The Government must also prove that Levasseur "knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm" as well as the fact that the firearm was possessed in or affected interstate commerce. *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019).

[2] State offenses "classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less" are excluded from qualifying as a crime punishable by imprisonment for a term exceeding one year. 18 U.S.C. § 921(a)(20)(B).

The Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment "conferred an individual right to keep and bear arms." *Id.* at 595. *Heller* involved a challenge to a District of Columbia law banning handgun possession in the home and requiring lawful firearms in the home to be kept inoperable at all times. *Id.* at 628. The *Heller* Court held the District of Columbia's law unconstitutional, reasoning that the law infringed on "the inherent right of self-defense [that is] central to the Second Amendment right." *Id.* The Court did not assign a particular level of scrutiny to Second Amendment challenges, but observed, in response to Justice Breyer's dissent, that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," banning handguns from the home "would fail constitutional muster." *Id.* at 628–29. Two years after deciding *Heller*, the Supreme Court incorporated the Second Amendment right to the States through the Fourteenth Amendment and held that the city of Chicago's similar law was likewise unconstitutional in *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 749 (2010).

After *Heller* and *McDonald*, many courts of appeal, including the First Circuit, adopted a two-step test for analyzing Second Amendment claims. First, a court would ask "whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee." *Gould v. Morgan*, 907 F.3d 659, 668–69 (1st Cir. 2018), *abrogated by Bruen*, 142 S. Ct. 2111. If the law imposed no burden on the Second Amendment right, then the law was constitutional. But if the law burdened "conduct

falling within the scope of the Second Amendment," the court would then "determine what level of scrutiny is appropriate" and "proceed to decide whether the challenged law survive[d] that level of scrutiny." *Id.* at 669. Whether strict or intermediate scrutiny would apply depended "on how closely a particular law or policy approach[ed] the core of the Second Amendment right and how heavily it burden[ed] that right." *Id.* at 670–71. Laws or policies burdening conduct "falling within the core of the Second Amendment" were subject to strict scrutiny, whereas laws or policies burdening "conduct falling outside the core of the Second Amendment" were subject to a less demanding level of scrutiny. *Id.* at 671.

Twelve years after *McDonald*, the Supreme Court revisited the Second Amendment in *New York State Rifle and Pistol Ass'n, Inc. v. Bruen*. 142 S. Ct. 2111 (2022). There, the Court held unconstitutional New York's handgun-licensing regime requiring applicants to demonstrate a "special need for self-defense" before they could carry a handgun outside of the home. *Id.* at 2122. The Court also abrogated the two-step framework adopted by the courts of appeals, explaining that it was "one step too many" because "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2127. The Supreme Court explained:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129–30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Following *Bruen*, criminal defendants across the nation have asserted Second Amendment defenses against felon-in-possession prosecutions. The First Circuit has not yet considered what *Bruen* means in this context,[3] and the parties' disagreement begins with the text of the Second Amendment. More specifically, the parties contest whether Levasseur, as a felon, is one of "the people" protected by the Second Amendment who can assert an as-applied challenge.

**A. Levasseur May Assert an As-applied Challenge**

The parties first dispute whether Levasseur's felon status removes him from "the people" who are protected by the Second Amendment. The Government, quoting *Heller* and *Bruen*, argues that the Second Amendment is limited to "law-abiding, responsible citizens." *See Heller*, 554 U.S. at 635. The Government further contends that First Circuit precedent as well as out-of-circuit authority favors its position. Levasseur argues that even though he is alleged to be a felon, he may still assert an as-applied challenge because he is one of "the people" protected by the Second Amendment. I conclude that Levasseur is one of "the people" protected by the Second Amendment and that he may bring an-applied challenge.

A close reading of *Heller* undermines the Government's argument. As the Third Circuit recently observed in *Range v. Attorney General United States of America*, 69 F.4th 96, 101 (3rd Cir. 2023) (en banc), the Government's argument conflicts with *Heller*'s observation that "'the people' as used throughout the Constitution 'unambiguously refers

---

[3] In *United States v. Thompson*, the First Circuit enforced an appeal waiver in a plea agreement and thus did not decide the merits of a Second Amendment challenge. 62 F.4th 37, 43 (1st Cir. 2023).

to all members of the political community, not to an unspecified subset.'" *Id.* (quoting *Heller*, 554 U.S. at 580). Thus, *Heller* explained that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. The Government cannot overcome this "strong presumption" as it relates to all felons. *Id.* Furthermore, while the *Heller* Court referenced law-abiding citizens, the Court never categorically excluded felons from the protection of the Second Amendment. For example, *Heller* merely described the Supreme Court's precedent as recognizing that "the Second Amendment does not protect *those weapons* not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625 (emphasis added). Rather than supporting the bold proposition that felons are not part of "the people" as that phrase is used in the Second Amendment, this passage suggests that the scope of the Second Amendment right is understood by reference to the firearm-ownership customs of law-abiding citizens.

In addition to the conflict between the Government's reading of "the people" and *Heller*, the Government's argument would result in an "inconsistent reading of 'the people.'" *Range*, 69 F.4th at 102. The phrase "the people" appears multiple times in the Constitution and the Bill of Rights.[4] The Supreme Court has explained that "the people"

---

[4] *See* U.S. Const. pmbl. ("We *the People* of the United States . . . ." (emphasis added)); *id.* Art. I, § 2 ("The House of Representatives shall be composed of Members chosen every second Year by *the People* of the several States . . . ." (emphasis added)); *id.* amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of *the people* peaceably to assemble, and to petition the Government for a redress of grievances." (emphasis added)); *id.* amend IV ("The right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." (emphasis added)); *id.* amend IX ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by *the people*." (emphasis added)); *id.* amend X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to *the people*." (emphasis added)).

is a term of art referring to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). Thus, the Supreme Court has held that aliens outside of the United States are not protected as part of "the people" under the Fourth Amendment. *See id.* at 274–75; *see also United States* ex rel. *Turner v. Williams*, 194 U.S. 279, 292 (1904) (holding that an excludable alien had no First Amendment rights since "h[e] does not become one of the people to whom these things are secured by our Constitution by an attempt to enter, forbidden by law"). The Supreme Court has never held that felons are not protected as part of "the people" in other provisions of the Constitution, such as the Fourth Amendment, so I reject the Government's proposed interpretation. The better understanding of the Second Amendment right is that "'all people have the right to keep and bear arms,' though the legislature may constitutionally 'strip certain groups of that right.'" *Range*, 69 F.4th at 102 (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)).

The Government argues that the *Heller* Court's disclaimer that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" necessarily means that Levasseur's as-applied challenge will fail. 554 U.S. at 626. But the *Heller* Court acknowledged that it "identif[ied] these *presumptively* lawful regulatory measures only as examples." *Id.* at n.26 (emphasis added). And as discussed above, felons retain Second Amendment rights under *Heller*. The Government also discusses two First Circuit cases that have quoted this passage from *Heller*, but these cases did not bar felons from bringing as-applied challenges to § 922(g)(1).

The Government first appeals to *United States v. Booker*, 644 F.3d 12 (1st Cir. 2011). *Booker* involved a facial Second Amendment challenge to 18 U.S.C. § 922(g)(9), which prohibits persons who have "been convicted in any court of a misdemeanor crime of domestic violence" from possessing a firearm. The First Circuit rejected the challenge and remarked that *Heller*'s passage concerning the longstanding prohibitions of firearm possession means that "the Second Amendment permits categorical regulation of gun possession by classes of persons—e.g., felons and the mentally ill—rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." *Booker*, 644 F.3d at 23 (citation omitted). The Government argues that this passage dooms as-applied challenges by felons.

Next, the Government discusses *United States v. Torres-Rosario*, 658 F.3d 110 (1st Cir. 2011), which was decided just months after *Booker*. *Torres-Rosario* concerned an as-applied challenge to § 922(g)(1). There, the First Circuit observed that all "of the circuits to face the issue post *Heller* have rejected blanket challenges to felon in possession laws." *Torres-Rosario*, 658 F.3d at 113. The court recognized that the *Heller* Court "may have qualified this approval [of felon-in-possession laws] by describing such longstanding bans as 'presumptively lawful.'" *Id.* (quoting *Heller*, 554 U.S. at 627 n.26). The court explained "at most that [the *Heller* Court's] description reserves the possibility of yet to be developed qualifications" and that "the Supreme Court may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban." *Id.* The First Circuit ultimately rejected Torres-Rosario's as-applied challenge given his previous convictions for "serious drug offenses—distribution and possession with intent to

distribute Class A controlled substances." *Id.* The court reasoned that even if the Supreme Court "might find some felonies so tame and technical as to be insufficient to justify the ban, drug dealing is not likely to be among them." *Id.*

Contrary to the Government's arguments, *Booker* and *Torres-Rosario* cannot be read to prevent felons from bringing as-applied challenges. While the First Circuit in *Booker* expressed that the Second Amendment permits the categorical regulation of firearms, that statement was made in the context of rejecting a facial challenge. Booker's claim failed because the statute had "a plainly legitimate sweep," and the court's language is best understood as a rejection of a facial challenge to the legislature's ability to promulgate categorical regulations. *Booker*, 644 F.3d at 22 (quoting *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 449 (2008)). Furthermore, *Torres-Rosario*, like this case, involved an as-applied challenge to § 922(g)(1), and the First Circuit seemingly approved of and engaged in an analysis of the defendant's prior convictions because he brought an as-applied challenge. *Torres-Rosario*, 644 F.3d at 113. Thus, *Booker* does not support the Government's argument and *Torres-Rosario* further undermines it.

The Government also cites to numerous cases decided before *Bruen* by other courts of appeals to support its claim about felons. *See, e.g.*, *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (per curiam) ("This language [from *Heller*] suggests that statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment."); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) ("Thus, felons are categorically different from the individuals who have a

fundamental right to bear arms . . . .").  The Government further cites to recent district court cases which concluded that these pre-*Bruen* cases remain binding precedent.

While many courts—whose edicts are not binding on this Court—have relied on the *Heller* Court's language concerning the "longstanding prohibitions on the possession of firearms by felons" to establish a constitutional, categorical rule against all felons, *Heller*, for the reasons discussed above, does not support the withholding of Second Amendment rights from all felons.  554 U.S. at 626.  As such, I decline to adopt such a rule.  Further, many of the out-of-circuit cases relied upon by the Government were decided before *Bruen*, so their persuasive force has been undermined.[5]

*Bruen*, the most recent case concerning the Second Amendment that is binding on this Court, also does not support the Government's position.  While the *Bruen* Court recognized that the Second Amendment is "subject to certain reasonable, well-defined restrictions," it does not support a categorical rule against felons.  142 S. Ct. at 2156.  The Government emphasizes that the *Bruen* decision referenced law-abiding citizens fourteen times.  I acknowledge the fact that the petitioners were law-abiding citizens was relevant to the Court's analysis and made for a simpler ruling, but such a term of art does not establish a categorical disarmament of all felons.  *See, e.g.*, *id.* ("New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms.").  But

---

[5] Some courts of appeals and district courts in other circuits have concluded that *Bruen* did not abrogate circuit precedent holding that § 922(g)(1) was constitutional regardless of the underlying prior felony conviction.  *See, e.g.*, *Vincent v. Garland*, 80 F.4th 1197, 1199–1202 (10th Cir. 2023); *United States v. Riley*, 635 F. Supp. 3d 411, 424 (E.D. Va. 2022).  The First Circuit, for the reasons explained above, did not establish precedent holding that § 922(g)(1) is constitutional as applied to all felons.

*Bruen* disfavors the Government's argument because the Court adopted *Heller*'s broad understanding of the "the people," instructing that "when the Second Amendment's plain text covers an *individual's* conduct, the Constitution presumptively protects that conduct." *Id.* at 2126 (emphasis added).   The Government's argument conflicts with the *Bruen* Court's clear rule.[6]

For these reasons, I conclude that felons remain among "the people" protected by the Second Amendment, so Levasseur may bring an as-applied challenge.

## B.  The Second Amendment Presumptively Protects Levasseur's Conduct

I must next consider whether "the Second Amendment's plain text covers" Levasseur's conduct.  *Id.*  It clearly does.  Levasseur is being prosecuted for allegedly being a felon in possession of a firearm, but the Second Amendment protects his right "to keep and bear Arms."[7]  U.S. Const. amend. II.  Thus, "the Constitution presumptively protects

---

[6] The Government argues that a categorical rule against felons is appropriate because eight members of the *Bruen* Court have joined at least one opinion approving of *Heller*'s passage about statutes that disarm felons.  *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (quoting *Heller*'s passage about the longstanding prohibitions on felons possessing firearms); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("Like Justice Kavanaugh, I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding."); *New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York*, 140 S. Ct. 1525, 1540 (2020) (Alito, J., joined by Gorsuch and Thomas, JJ., dissenting) ("We recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals.").  But *Heller* and *Bruen* are, for the reasons explained above, inconsistent with the Government's proposed rule.  Furthermore, the pastiche of dissenting and concurring opinions across several different cases does not somehow result in an alchemy of binding precedent.  When it comes to interpreting the holding of Supreme Court opinions, the whole is greater than the sum of its parts.  *Cf. Marks v. United States*, 430 U.S. 188, 193–94 (1977); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2176 (2023) ("A dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion.").

[7] There are no allegations that Levasseur's alleged possession of a firearm was for an unlawful purpose. *Cf. Heller*, 554 U.S. at 611 (discussing sources suggesting that the Second Amendment right would not

[Levasseur's] conduct," and the Government has the burden of demonstrating "that [this prosecution] is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

### C. The Historical Tradition of Firearm Regulation Demonstrates that Congress May Disarm Persons Viewed as Dangerous

To survive this motion to dismiss, the "government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. The *Bruen* Court's analysis of the Second Amendment right as it applied to the States through the Fourteenth Amendment is illustrative. The Supreme Court's inquiry focused on two critical years: 1791 (when the Second Amendment was ratified) and 1868 (when the Fourteenth Amendment was ratified).[8] *Id.* at 2138. The Court observed that the English common-law practices of a right are relevant to interpreting rights later enshrined in the Constitution and that post-enactment history may be helpful in determining the meaning of the Second Amendment. *See id.* at 2136–38. The *Bruen* Court recognized that this analysis "will often involve reasoning by analogy." *Id.* at 2132. The Government can satisfy its burden by "identify[ing] a well-established and representative historical *analogue*." *Id.* at 2133. The Government need not point to a "historical *twin*." *Id.* But "when a challenged regulation

---

extend to unlawful purposes).

[8] The Court "acknowledge[d] that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Bruen*, 142 S. Ct. at 2138. The Court concluded that it did not need to address the issue since the public understanding of the right to keep and bear arms as it related to public carry in 1791 and 1868 was the same. *Id.*

addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131.  On the other hand, "regulations that were unimaginable at the founding" must only be "relevantly similar." *Id.* at 2132.

Levasseur and the Government read the historical record differently.   The Government argues that legislatures may disarm people who have demonstrated a disregard for the rule of law by committing felonies.  Levasseur refutes this conclusion, arguing that he cannot be disarmed because nonviolent felons were not historically prohibited from possessing firearms.  The Government presents two arguments from history in support of its position.

First, the Government argues that firearm disqualification laws support its interpretation of history.  Because the Second Amendment "codified a right 'inherited from our English ancestors,'" the Government's analysis of history begins with the English tradition of regulating firearms.  *Id.* at 2139 (quoting *Heller*, 554 U.S. at 599).   The Government claims that England's tradition of disarming persons, such as Papists, who the legislature viewed as unable to follow the law, is relevant to understanding the Second Amendment right.   In 1689, the English government enacted an "Act for the Better Secureing the Government by Disarming Papists and Reputed Papists."  *See* 1 W. & M., Sess. 1, c.15 (Eng. 1688).   This act prohibited Papists from possessing firearms or ammunition.  *Id.*  Persons who took an oath declaring their loyalty would have this penalty discharged.  *Id.*   The Government next explains that, in colonial America, Native

13

Americans and African Americans were disarmed because they were viewed as untrustworthy. *See* Alexander DeConde, Gun Violence in America 22 (2001) ("Although the colonial demand for such discriminatory controls sprang from circumstances different from those in England, as in applying them against Indians and blacks, colonists usually followed home-country practices of excluding other distrusted people from ownership."). Furthermore, during the Revolutionary War, several colonial governments passed legislation prohibiting persons who refused to declare an oath of loyalty from possessing firearms. Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004). The Government further relies on various proposed constitutional amendments in State ratifying conventions, such as the one proposed by the Pennsylvania Antifederalists, which would have provided that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971). The Government contends that this historical record demonstrates that legislatures can categorically disqualify persons, such as felons, from exercising Second Amendment rights based on a view that they cannot be trusted to follow the law.

Second, the Government argues that the historical practice of punishing felons with death or estate forfeiture demonstrates that the Second Amendment permits the legislature to strip all felons of Second Amendment rights. As explained by Blackstone, felonies were "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to

the degree of guilt." 4 William Blackstone, Commentaries on the Laws of England 95 (1769). Blackstone further explained that the "idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 97. Thus, "if a statute makes any new offence felony, the law implies that it shall be punished with death, *viz.* by hanging as well with forfeiture." *Id.* (footnote omitted). In support of this concept, the Government describes how the First Congress passed a statute making treason, murder on federal land, piracy on the high seas, and forging or counterfeiting a public security punishable by death. An Act for Punishment of Certain Crimes Against the United States, 1 Stat. 112, 112–15 (1790). The Government further contends that the practice of authorizing complete forfeiture of a felon's estate supports its position. Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn. 275–76 (2014).

Courts have reached differing conclusions from this historical record. On the one hand, the Eighth Circuit recently concluded that "history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." *Jackson*, 69 F.4th at 504. Thus, reasoned the Eighth Circuit, there is "no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)." *Id.* at 502. On the other hand, the Third Circuit rejected the Government's proposed standard, reasoning that the Government failed to "analogize those groups" that have historically been disarmed to the petitioner, a felon previously convicted of making a fraudulent statement to obtain food stamps, and that "any such analogy would be 'far too broad[].'" *Range*, 69 F.4th at 104–05 (alteration in original) (quoting *Bruen*, 142 S. Ct. at 2134). The

15

Third Circuit also found the Government's discussion of Founding-era punishments for felons unpersuasive because the historical practice of punishing "some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition." *Id.* at 105.

I find the Third Circuit's analysis to be more consistent with the historical tradition of firearm regulation and thus more persuasive. The history of governments categorically disarming racial and religious groups does not support the Government's argument. First of all, disarmament based on protected classes, such as race or religion, would clearly be unconstitutional today under the First and Fourteenth Amendments. And the fact that legislatures disarmed these groups of persons says little about whether felons can categorically be disarmed. The Government's analogy comparing disarmament of classes of persons to felons is "far too broad[]." *Range*, 69 F.4th at 105 (alteration in original) (quoting *Bruen*, 142 S. Ct. at 2134).

The historical practices of punishing felons does not support the Government's argument for several reasons. First, the Government's argument fails to consider the breadth of § 922(g)(1), which applies to any person convicted of a felony punishable by more than one year of incarceration. Historically, only the most serious crimes were felonies, and they accordingly were punished by death. But § 922(g)(1) is incongruous with history since it labels as felons persons who have committed far less serious offenses.[9]

---

[9] *See, e.g.*, 17-A M.R.S. § 359(1)(B)(4) (punishing knowingly receiving stolen property worth more than $1,000 but less than $10,000 with up to five-years' incarceration); *id.* § 360(1)(A-1) (punishing the unauthorized use of property with up to five-years' incarceration for defendants with two theft-related prior convictions); *id.* § 708(1)(B)(2) (punishing negotiating a worthless instrument worth more than $1,000 but less than $10,000 with up to five-years' incarceration); *id.* § 908(F) (punishing the intentional

Moreover, imposing the death sentence for many of these felonies would likely be unconstitutional today.[10]  Second, the fact that the death penalty and estate forfeiture were imposed as punishments against founding-era felons does not mean that the legislature may constitutionally disarm all modern felons at scale.  This argument is a misapplication of the transitive property of order, in the extreme.  If accepted, the Government's argument would seemingly permit legislatures to strip every constitutional right of modern felons simply because their criminal forbearers were historically punished with death and estate forfeiture.[11]  That asymmetrical sweep of a mighty regulatory broom simply cannot be the law.  Here, too, the Government's analogy to history is too broad, and it must be rejected since it would, in effect, treat the Second Amendment as a "second-class right, subject to an entirely different body of rules" by permitting legislatures to infringe on felons' Second Amendment rights without judicial review.  *See McDonald*, 561 U.S. at 780 (plurality opinion). The Government's argument concerning the challenges of making individualized determinations and the advantages of its categorical rule does not change the fact that its position is not supported by the historical record.  The Government understandably wishes

---

misrepresentation of a material fact relating to home construction with up to five-years' incarceration for a defendant with two prior convictions under this statute).

[10] *See Kennedy v. Louisiana*, 554 U.S. 407, 420 (2007) (holding that the Eighth Amendment's prohibition against cruel and unusual punishments forbids the imposition of the death penalty against a defendant who did not cause death or intend to cause death during the commission of a crime).

[11] The Government argues that felons forfeit several rights tied to membership in the political community, including the right to serve on a jury, the right to hold office, and the right to vote, so felons forfeit their Second Amendment rights.  The Constitution, however, does not protect the right to serve on a jury or the right to hold office.  While the Fourteenth Amendment protects the right to vote, it recognizes that the right to vote may be "abridged . . . for participation in rebellion, or other crime," so this practice does not support the Government's argument about the Second Amendment.  U.S. Const. amend. XIV, § 2.

to extinguish the prospect of felon-by-felon challenges to lifetime disarmament, which is why its arguments amount to a Venn diagram with categorical treatment of felons at its core.  While the desire for office efficiency is an understandable impulse, expediency should not be confused with constitutional fidelity based on the plain historical record.

Levasseur offers a different interpretation of history.  Because statutes have not historically disarmed nonviolent felons, Levasseur argues that § 922(g)(1) is unconstitutional as applied to him.  Levasseur is correct in observing that statutes disarming felons did not exist at the time of the adoption of both the Second and Fourteenth Amendments.  The First Circuit in *Booker* observed that § 922(g)(1) "is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified."  644 F.3d at 24.  The Federal Firearms Act of 1938 "initially covered those convicted of a limited set of violent crimes such as murder, rape, kidnapping, and burglary, but extended to both felons and misdemeanants convicted of qualifying offenses."  *Id.* (citing Federal Firearms Act, Pub. L. No. 75-785, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51 (1938)).  In 1961, the "law was expanded to encompass all individuals convicted of a felony (and to omit misdemeanants from its scope)."  *Id.* (citing An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, § 2, 75 Stat. 757, 757 (1961)).  But Levasseur reads the history of firearm regulation too narrowly by demanding a historical twin.

The common thread tying the early-American history of firearm regulation together is that governments exercised authority to disarm persons seen as too dangerous to possess

a firearm.  The English practice of disarming subjects, such as Catholics, resulted from a "fear that a person, although technically an English subject, was because of his beliefs effectively a resident enemy alien liable to violence against the king."  C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 723 (2009). Similarly, the colonial discriminatory practice of disarming Native Americans and African Americans stemmed from a concern that they would revolt or threaten public safety. *Kanter*, 919 at 458 (Barrett, J., dissenting) (first citing Joyce Lee Malcolm, To Keep and Bear Arms 140–41 (1994); then citing Adam Winkler, Gunfight 115–16 (2011); and then citing Deconde, *supra*, at 21–22 (2001)); *see also* Malcolm, *supra*, at 141 (explaining that Native Americans and African Americans "were, like English Catholics, also regarded as a threat to the established order").  During the American revolution, the disarmament of Loyalists reflected that "American legislators had determined that permitting these persons to keep and bear arms posed a potential danger."  *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012), *abrogated by Bruen*, 142 S. Ct. 2111.  None of these firearm regulations existed because certain groups of persons were, in fact, violent criminals, so Levasseur's argument for a violent-criminal limitation on § 922(g)(1) is off the mark.[12]  *See* Winkler, *supra*, at 115–16

---

[12] Levasseur argues that it would be easier to determine whether a crime is a violent crime rather than whether someone is dangerous.  He appeals to 18 U.S.C. § 16, which defines crimes of violence.  *See id.* (defining crimes of violence as offenses with "an element the use, attempted use, or threatened use of physical force against the person or property of another" or offenses that are felonies and "involve[] a substantial risk that physical force against the person or property may be used in the course of committing the offense.").  But the historical record does not support a standard based on violence, and it is unlikely that a statute enacted far after the passage of the Second and Fourteenth Amendments sheds light on the meaning of the Second Amendment.  Furthermore, there would still be challenging determinations under a violence standard.  *Cf. Johnson v. United States*, 576 U.S. 591, 596 (2015) (holding that the Armed

(explaining that certain racial groups were disarmed "out of fear that these groups would use guns to revolt against slave masters," even if they "were completely law-abiding").

The proposed constitutional amendments concerning the right to bear arms further support the authority of the legislature to disarm persons seen as dangerous.  While the Pennsylvania Antifederalists' proposed constitutional amendment would have permitted disarmament of persons "for crimes committed, or real danger of public injury from individuals," other proposals would have only limited the right of dangerous persons to bear arms.  2 Schwartz, *supra*, at 665.  For example, Massachusetts considered an amendment providing that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." *Id.* at 681.  Similarly, New Hampshire considered a proposal that would have prohibited Congress from disarming "any Citizen unless such as are or have been in Actual Rebellion." *Id.* at 758, 761.  The takeaway from these proposals is that the right to bear arms was understood to have limits, and the categorical restrictions were "not about felons in particular or even criminals in general;" instead, they were "about threatened violence and the risk of public injury."  *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (citing *Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 368 (3d Cir. 2016) (Hardiman, J., concurring in part and concurring in the judgments)).

---

Career Criminal Act's definition of a violent felony, which included "conduct that presents a serious potential risk of physical injury to another" was unconstitutional since it was void for vagueness (quoting 18 U.S.C. § 924(e)(2)(B))).

Levasseur argues that § 922(g)(1) is not sufficiently analogous to the early-American practice of firearm regulation because statutes did not impose lifetime disarmament against felons. But Levasseur is demanding a historical twin. Having reviewed the historical record, I conclude that § 922(g)(1) is sufficiently analogous to the historical practices of disarming dangerous persons insofar as the statute disarms felons who can reasonably be viewed as too dangerous to possess a firearm. *See Range*, 69 F.4th at 112 (Ambro, J., concurring) (explaining that "Section 922(g)(1) thus disarms [felons] for the same reason we prohibited British loyalists from being armed.").

### D. This Prosecution Is Consistent with the Historical Tradition of Disarming Persons Viewed as Dangerous

Having concluded that the historical record supports disarming persons seen as dangerous, I must finally consider whether disarming and prosecuting Levasseur for possessing a firearm is consistent with this historical practice. If Levasseur's prior convictions establish that he is sufficiently dangerous, then his as-applied challenge will fail. *See id.* (explaining that § 922(g)(1) is unconstitutional as applied if "an individual subject to § 922(g)(1) would not, if armed, plausibly pose a threat to the orderly functioning of society"); *United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011) (requiring a showing that someone "is no more dangerous than a typical law-abiding citizen" or that one is no longer a "continuing threat to society" to prevail on an as-applied challenge), *overruled by Binderup*, 836 F.3d 336.

*Torres-Rosario* offers guidance to this analysis. There, the First Circuit concluded that, "two of Torres-Rosario's prior convictions were for serious drug offenses—

distribution and possession with intent to distribute Class A controlled substances—and drug dealing is notoriously linked to violence," so his Second Amendment as-applied challenge to § 922(g)(1) failed. *Torres-Rosario*, 658 F.3d at 113 (first citing *United States v. Luciano*, 329 F.3d 1, 6 (1st Cir. 2003); and then citing *United States v. Green*, 887 F.2d 25, 27 (1st Cir. 1989)). Even if, reasoned the First Circuit, "the Supreme Court might find some felonies so tame and technical as to be insufficient to justify the ban, drug dealing [was] not likely to be among them." *Id.*[13]

Levasseur argues that under the dangerousness standard, none of his alleged prior convictions demonstrate that he is sufficiently dangerous such that § 922(g)(1) can constitutionally apply to him. Levasseur argues that his alleged prior conviction for possession of an unlawful controlled substance differs from *Torres-Rosario*, where the defendant was previously convicted of distribution and possession with the intent to distribute controlled substances, because Levasseur's prior conviction is simply for possession. He argues that possession alone is meaningfully different since it is more dangerous to distribute drugs. In response, the Government argues that possession alone is sufficiently dangerous such that Levasseur can be disarmed.

---

[13] District courts have reached differing conclusions about what the historical tradition of firearm regulation supports. *See United States v. Posey*, No. 2:22-CR-83 JD, 2023 WL 1869095, at *7 (N.D. Ind. Feb. 9, 2023) (holding 18 U.S.C. § 922(g)(3)'s prohibition against unlawful users of any controlled substance possessing firearms is constitutional because it is "sufficiently analogous" to regulations by state legislatures restricting the right of habitual drug users or alcoholics to possess or carry firearms and regulations preventing dangerous persons, such as felons and the mentally ill, from possessing firearms). *But see United States v. Quailes*, No. 1:21-CR-0176, 2023 WL 5401733, at *12 (M.D. Pa. Aug. 22, 2023) (rejecting that the Government had met its burden under a dangerousness standard to disarm a felon because the "comparison is too broad").

I agree with the Government. Even one who simply possesses a controlled substance like methamphetamine must generally obtain it from someone else, and firearms are often involved in drug transactions. This dangerous connection between illegal drugs and firearms is well-known and has been recognized by Congress. *See* 18 U.S.C. § 924(c)(1)(A) (establishing additional penalties for persons who "during and in relation to any . . . drug trafficking crime . . . use[] or carr[y] a firearm, or who, in furtherance of any such crime, possess[] a firearm"); *see also Smith v. United States*, 508 U.S. 223, 240 (1993) ("When Congress enacted the current version of § 924(c)(1), it was no doubt aware that drugs and guns are a dangerous combination."). Thus, Levasseur's alleged prior felony conviction for the possession of methamphetamine makes him sufficiently dangerous that he may constitutionally be disarmed.[14]

## CONCLUSION

For these reasons, Levasseur's Motion to Dismiss the Indictment (ECF No. 26) is **DENIED**.

SO ORDERED.

Dated this 11th day of October, 2023.

 /s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE

---

[14] My analysis rests solely upon Levasseur's alleged conviction for illegally possessing a controlled substance under 17-A M.R.S. § 1107-A(1)(B)(7). I express no opinion as to whether his other alleged convictions, individually or collectively, affect my analysis.

23